UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ELIZABETH INGE, individually, and
JOHNNY INGE, individually,

    Plaintiffs,

vs.                                        No. 16 CV 1232 JAP/LAM

ROBERT (BOB) McCLELLAND, III,
individually, and doing business as,
BOB'S BUDGET PHARMACY,

    Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO DISMISS

In DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT (Doc. No. 26) (Motion), Defendant Robert McClelland (Defendant) asks the Court to dismiss all claims asserted in the FIRST AMENDED CIVIL COMPLAINT FOR VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT; NEGLIGENCE; BREACH OF FIDUCIARY DUTIES, UNFAIR PRACTICES; AND PUNITIVE DAMAGES (Doc. No. 2) (Amended Complaint). Plaintiffs oppose the Motion. *See* PLAINTIFFS' RESPONSE TO "DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT" [DOC. 26] (Doc. No. 30) (Response). Defendant submitted a reply brief. *See* DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFF'S COMPLAINT (Doc. No. 33) (Reply). Because Plaintiffs' claims are barred under the wrongful conduct rule and its corollary, the *in pari delicto* doctrine, the Court will grant the Motion and will dismiss with prejudice all claims in the Amended Complaint.

I.  STANDARD OF REVIEW

Normally a motion to dismiss for failure to state a claim should be made prior to filing the answer or in the answer itself. Fed. R. Civ. P. 12(b)(6). If the defendant moves to dismiss after filing the answer, the motion should generally be treated as a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c), (h)(2); *Lowe v. Town of Fairland, Okla.,* 143 F.3d 1378, 1381 n. 5 (10th Cir. 1998); *Republic Steel Corp. v. Pennsylvania Eng'g Corp.,* 785 F.2d 174, 182 (7th Cir. 1986). In evaluating a Rule 12(c) motion, however, the court applies the same standard used in deciding Rule 12(b)(6) motions to dismiss. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1160 (10th Cir. 2000) ("A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).").

Under Rule 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion "tests the sufficiency of the allegations within the four corners of the complaint." *Romero v. United States*, 159 F. Supp. 3d 1275, 1279 (D.N.M. 2015) (citation omitted). When considering a Rule 12(b)(6) motion, the court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. *Smith v. United States,* 561 F.3d 1090, 1097 (10th Cir.2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, the court typically considers only the facts alleged in the complaint. *Martin v. Central States Emblems, Inc.*, 150 F. App'x 852, 857 (10th Cir. Oct. 11, 2005) (unpublished) (citing *County of Santa Fe v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002)). However, the court may review documents referred to in a complaint, without converting a motion to dismiss into a motion for summary judgment, if the documents are central to the plaintiff's claim and the parties do not dispute their authenticity. *Martin*, 311 F.3d at 1035 (citing *County of Santa Fe*). The court may also consider documents of which the court may take judicial notice. *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1190 (D.N.M. 2013).

## II.  BACKGROUND

Plaintiffs allege that between approximately July 26, 2013 and January 29, 2015, Defendant, a licensed pharmacist,[1] filled prescriptions for Plaintiff Johnny Inge for improper and dangerous amounts of opioids and other controlled substances "knowing that there was absolutely no medical necessity or benefit to prescribing these medications[.]" (Am. Compl. ¶ 9 v-vi.) For example, during that time period Defendant dispensed to Mr. Inge 5,160 oxycodone pills, a Schedule II narcotic, in dosage amounts intended for end-stage cancer patients. (*Id.* ¶ 9 vi.) Defendant also dispensed to Mr. Inge 1,560 tramadol pills, a Schedule IV narcotic. Between November 25, 2013 and January 29, 2015, Defendant filled numerous prescriptions for Plaintiff Elizabeth Inge. For

---

[1] Defendant's pharmacist license is in probationary status under a "Settlement Agreement" with the New Mexico Board of Pharmacy. (Am. Compl. ¶ 9 v.) Defendant was also criminally charged and agreed to a pre-prosecution diversion program to avoid incarceration. *State v. McClelland*, Case No. D-1010-CR-201600036.

3

example, Defendant dispensed to Mrs. Inge 1,650 tramadol pills and 6,540 oxycodone pills at potency levels given to end-stage cancer patients. (*Id.* ¶ 9 vii.) (*See also* Am. Compl. Exs. 1–2 (printout of prescriptions filled for Plaintiffs at Bob's Budget Pharmacy)). Defendant also allowed Plaintiffs to pay cash for some prescriptions in violation of Medicaid rules and regulations. (*Id.* ¶ 9 viii.)[2]

In PLAINTIFFS' SUPPLEMENTAL JOINT STATUS REPORT AND PROVISIONAL DISCOVERY PLAN CONTENTIONS (Doc. No. 18) (Plaintiffs' Supplemental Joint Status Report), Plaintiffs explain that in June 2013, Mr. Inge received a telephone call from David Jones, a Nurse Practioner. (*Id.* at 1.) Although Mr. Inge had not heard from Mr. Jones the previous two years, Mr. Jones knew that Mr. Inge was "recovering from prescription pill use and approached him because of his known vulnerability." (*Id.* at 1–2.) Mr. Jones proposed to write prescriptions for powerful narcotic pain pills for Mr. Inge; and after Mr. Inge filled those prescriptions, Mr. Inge would share half of the pills with Mr. Jones. (*Id.* at 2.) Mr. Inge agreed and picked up the written prescriptions from various drop locations. (*Id.*) Mr. Inge attempted to fill the initial prescription at Wellburn Pharmacy in Tucumcari, New Mexico; however, the pharmacist refused to fill "such a large prescription for Mr. Jones." (*Id.*) Mr. Inge then took the prescription to Defendant, who filled the prescription "knowing that the prescription was bogus; that it was improper and illegal for [Jones] to be prescribing such strong narcotics for a healthy individual[.]" (*Id.*) Over the ensuing months, Defendant

---

[2] In the Amended Complaint, Plaintiffs also allege that Defendant filled prescriptions for other dangerous drugs including, Gabapentin, Alprazolam, and Carisoprodol. Gabapentin is used to prevent and control seizures and to relieve nerve pain. Alprazolam is used to treat anxiety and panic disorders. It belongs to a class of medications known as benzodiazepines. It is a Schedule IV controlled substance also known as Xanax. Carisoprodol is used to treat muscle pain and is a muscle relaxant. It is a Schedule IV controlled substance also known as Soma.

filled numerous fraudulent prescriptions for both Mr. and Mrs. Inge. (Am. Compl. Exs. 1–2.)

As a result of obtaining and using these powerful drugs, Plaintiffs became addicted to the drugs, lost custody of their child, and lost employment. Mr. Inge was arrested for driving while intoxicated, and Mrs. Inge suffered an overdose. Plaintiffs also experienced painful withdrawal symptoms after losing access to the drugs. (*Id.* ¶ 11 i-iii.) In Count I, Plaintiffs assert a claim for civil damages under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962, 1964 (RICO). In Count II, Plaintiffs allege that Defendant was negligent in the provision of pharmacy services and acted in "wanton disregard of the rights of Plaintiffs," entitling Plaintiffs to actual and punitive damages. (*Id.* ¶¶ 15–17.) In Count III, Plaintiffs assert a claim against Defendant for "unfair, deceptive and unconscionable trade practices in the conduct of his business during the times Plaintiffs were patients." (*Id.* ¶ 19.) In Count IV, Plaintiffs aver that Defendant "entered into a fiduciary relation of trust and was bound to act in good faith with due regard for the interest of the Plaintiffs as an agent and health care provider" and that Defendant breached the fiduciary duty by filling prescriptions for dangerous drugs in excessive numbers and dosage amounts. (*Id.* ¶¶ 27–30.)

Defendant argues that Plaintiffs are barred from any recovery under the New Mexico "wrongful conduct rule." Defendant asks the Court to dismiss the Amended Complaint in its entirety. As explained below, Plaintiffs are barred from asserting their claims because they are based on Plaintiffs' own illegal conduct, acquiring narcotics through fraudulent prescriptions. Accordingly, the Court will grant the Motion.

III.   DISCUSSION

   A.   AFFIRMATIVE DEFENSE NOT WAIVED

As a preliminary matter, Plaintiffs argue that since Defendant failed to specifically plead the wrongful conduct rule as an affirmative defense in his Answer, Defendant has waived the defense and may not assert it in the Motion. Rule 8(c) states, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]" Fed. R. Civ. P. 8(c). The wrongful conduct rule is an affirmative defense to Plaintiffs' claims. *See Stringfellow v. Oakwood Hosp. and Med. Center*, 409 F.Supp.2d 866, 872 (E.D. Mich. 2005) (acknowledging that wrongful conduct rule is an affirmative defense).  However, Rule 8(c)'s core purpose is to "act as a safeguard against surprise and unfair prejudice, and strict adherence to the pleading requirement is inappropriate when the purpose of the requirement has otherwise been fulfilled." *Sanchez v. BNSF Railway Co.*, 976 F.Supp.2d 1265, 1267 (D.N.M. 2013) (Hansen, J.).  Hence, in ruling on the Motion, the Court will decide whether the wrongful conduct rule bars Plaintiffs' claims despite Defendant's failure to specifically plead it as an affirmative defense in his Answer. *See Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (ruling that failure to plead qualified immunity in answer was not fatal to party who raised the defense in a motion for summary judgment).

   B.   WRONGFUL CONDUCT RULE

Plaintiffs maintain that they were not violating the law when they presented prescriptions to be filled; however, Plaintiffs admitted their scheme to fill fraudulent prescriptions for narcotics in Plaintiffs' Supplemental Joint Status Report, a document that this Court may consider in ruling on the Motion. Plaintiffs' acquisition of narcotics

through fraudulent prescriptions is a violation of federal and state law. *See* 21 U.S.C. § 843(a)(3) (providing, "[i]t shall be unlawful for any person knowingly or intentionally— . . . (3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge[.]"); NMSA 1978 § 30-31-23 ("It is unlawful for a person intentionally to possess a controlled substance unless the substance was obtained pursuant to a valid prescription or order of a practitioner while acting in the course of professional practice."); NMSA 1978 § 30-31-25 ("It is unlawful for any person: . . . (3) to intentionally acquire or obtain, or attempt to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge."). Because Plaintiffs admit they agreed to share the narcotics with Jones, Plaintiffs also violated state and federal drug trafficking statutes. *See* NMSA 1978 § 30-31-20 (prohibiting possession of narcotic with intent to distribute) and 21 U.S.C. § 841(a)(1) (same).

Recently, the United States District Court for the District of New Mexico described the wrongful conduct rule and outlined its parameters:

> It is a well settled rule of law that a person cannot maintain
> an action if, in order to establish his cause of action, he
> must rely, in whole or in part, on an illegal or immoral act
> or transaction to which he is a party, or where he must base
> his cause of action, in whole or in part, on a violation by
> himself of the criminal or penal laws.

*Desmet v. Sublett,* 54 N.M. 355, 225 P.2d 141, 142 (1950). "The principle of this public policy is this: No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act." *Id.* Notably, the wrongful conduct rule forecloses recovery by the plaintiff even where "the defendant has participated equally in the illegal activity." *Orzel v. Scott Drug Co.*, 449 Mich. 550, 537 N.W.2d 208, 212–13 (1995). The contours of the wrongful conduct rule require that "the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute," and that "a sufficient causal nexus must exist between the plaintiff's illegal conduct and the plaintiff's asserted damage." *Id.* at 214–17. Further, "the defendant's culpability [must not be] greater than the plaintiff's culpability for the injuries[.]" ... *Id.* at 217 (citation omitted).

*Romero v. United States*, 159 F. Supp. 3d 1275, 1280–81 (D.N.M. 2015) *aff'd* 658 Fed. App'x 376 (10th Cir. 2016). In *Orzel,* a case on which the *Romero* court heavily relied, the Michigan Supreme Court held the plaintiff's negligence claim against a pharmaceutical company for honoring her husband's fraudulent prescriptions, which led to his death, was barred by the wrongful conduct rule because his injuries resulted from his wrongful conduct. *Id.* at 558–59. The Michigan Supreme Court equated the wrongful conduct rule with the common law maxim, known as the "doctrine of in pari delicto." *Id.*

> [A]s between parties in pari delicto, that is equally in the wrong, the law
> will not lend itself to afford relief to one as against the other, but will leave
> them as it finds them.

*Id.* (citations omitted, alterations in original). Finding no practical difference in their application, the court in *Orzel* referred to both of these doctrines as the wrongful conduct rule. *Id.*

C.  COUNT I RICO CLAIMS ARE BARRED

Even after Plaintiffs stopped presenting fraudulent prescriptions on January 29, 2015, Defendant allegedly continued to violate drug laws. (*Id.*¶ 9 vi.). On or about February 24, 2015 in Quay County, New Mexico, Defendant obtained or attempted to obtain a Schedule IV controlled substance, lorazepam, in violation of NMSA 1978 § 26-1-22(B).[3] (*Id.* ¶ 9 i-v.) On or about March 19, 2015, Defendant obtained or attempted to obtain a Schedule IV controlled substance, clonazepam, in violation of § 26-1-22(B). On the same date, Defendant unlawfully distributed a controlled substance in violation of NMSA 1978 § 30-31-25(A) (1)–(5).[4] On April 8, 2016, Defendant was criminally charged. On May 25, 2016, Defendant entered into a Settlement Agreement with the Board of Pharmacy admitting to several violations of New Mexico law. (*Id.*) Defendant's

---

[3] It shall be unlawful for any person to obtain or attempt to obtain any dangerous drug or to procure or attempt to procure the administration of any dangerous drugs other than a controlled substance:
A. by fraud, deceit, misrepresentation or subterfuge; or
B. by forgery or alteration of a prescription or of any written order; or
C. by the concealment of a material fact; or
D. by the use of a false name or the giving of a false name or the giving of a false address.

NMSA 1978 § 26-1-22.

[4] A. It is unlawful for any person:

> (1) who is a registrant to distribute a controlled substance classified in Schedule I or II, except pursuant to an order form as required by Section 30-31-17 NMSA 1978;
> (2) to intentionally use in the course of the manufacture or distribution of a controlled substance a registration number which is fictitious, revoked, suspended or issued to another person;
> (3) to intentionally acquire or obtain, or attempt to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge;
> (4) to intentionally furnish false or fraudulent material information in, or omit any material information from, any application, report or other document required to be kept or filed under the Controlled Substances Act, or any record required to be kept by that act; or
> (5) to intentionally make, distribute or possess any punch, die, plate, stone or other thing designed to print, imprint or reproduce the trademark, trade name or other identifying mark, imprint or device of another or any likeness of any of the foregoing, upon any drug or container or labeling thereof so as to render the drug a counterfeit substance.

NMSA 1978 § 30-31-25

9

pharmacist license was suspended for five years, with all but thirty consecutive days of the suspension held in abeyance. (*Id.*) Defendant was diverted into a pre-prosecution diversion program on August 15, 2016. (*Id.*)

Plaintiffs allege that Defendant's actions display a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).[5] (*Id.* ¶ 10.) Plaintiffs further allege that they were injured "as a direct and proximate result of Defendant's complained of acts, Plaintiffs suffered damages, including, pain and suffering, loss of enjoyment of life, loss of income, and earnings [sic] capacity[.]" (*Id.* ¶ 11.) Plaintiffs maintain that they are entitled to treble damages under 18 U.S.C. § 1964(c).[6] (*Id.* ¶ 12.)

Defendant argues that since Plaintiffs' injuries were a result of their willing participation in criminal conduct, Plaintiffs should not be allowed to recover damages under any theory, including treble damages under RICO. The Court agrees. Under the wrongful conduct rule, also known as the *in pari delicto* doctrine,[7] Plaintiffs' Count I RICO claim must be dismissed. *See Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008) ("We . . . hold that *in pari delicto* is a cognizable defense to a civil RICO claim.").

---

[5] "Racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.] 18 U.S.C. § 1961(1).
A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]" 18 U.S.C. § 1961(5).

18 U.S.C.A. § 1961(5).

[6] "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

18 U.S.C.A. § 1964(c).

[7] Black's Law Dictionary defines the *in pari delicto* doctrine as "The principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Black's Law Dictionary* 806 (8th ed. 2004).

In *Rogers*, the Fifth Circuit explained that to dismiss a RICO civil claim under the doctrine of *in pari delicto*, a defendant must show two elements: (1) the plaintiff actively participated in the RICO violation; and (2) the defense will not interfere with the policy goals of RICO. *Id.* The court found that both of the elements were met and upheld the dismissal of a civil RICO claim brought by directors of a bank who participated in an illegal check kiting scheme perpetrated by the bank's customer. *Id.* at 383–84. The court reasoned, "it would be anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute." *Id.* In other words, "[t]o allow co-conspirators to recover from each other would not . . . deprive violators of their ill-gotten gains, but would transfer the ill-gotten gains between them." *Id.*

In this case the same reasoning applies. Based on the allegations in the Amended Complaint and in Plaintiffs' Supplemental Joint Status Report, Plaintiffs instigated and actively participated in a scheme to acquire opioids through fraudulent prescriptions, they shared the fruits of their acquisition with Mr. Jones, and they abused and trafficked those prescription drugs. As a result of their illegal behavior, Plaintiffs suffered injuries to their health, their family, and their employment. Significantly, Plaintiffs were not "passive participant[s]" and thus, the first element is met.

As for the second element, the application of the *in pari delicto* defense in this case will not interfere with the policy goals of civil RICO. As the Eleventh Circuit stated, "Congress intended RICO's civil remedies to help eradicate 'organized crime from the social fabric' by divesting 'the association of the fruits of ill-gotten gains.' . . ." *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1155 (11th

Cir. 2006) (citations omitted). In that case, the court upheld the dismissal of claims brought on behalf of an organization at the center of a Ponzi scheme. *Id.* The court recognized that "recovery under RICO would not divest RICO violators of their ill-gotten gains; it would result in a wealth transfer among similarly situated conspirators." *Id.* Similarly, if this Court allowed Plaintiffs to recover for their injuries, Plaintiffs would in essence be rewarded for their illegal behavior in a way never intended by Congress in RICO. *Id.* at 1155 ("recovery under RICO would not divest RICO violators of their ill-gotten gains."). The allegations of the Amended Complaint and in the Plaintiffs' Supplemental Joint Status Report compel the conclusion that Plaintiffs had "substantially equal responsibility for their injuries" and barring their claims advances the policy of the RICO statute. *Id.* Thus, the doctrine of *in pari delicto* prevents Plaintiffs from bringing the Count I civil RICO claim for treble damages.

D. COUNTS II, III, AND IV TORT CLAIMS ARE BARRED

In similar fashion, New Mexico state law tort claims may be dismissed under the wrongful conduct rule if: (1) the plaintiff's conduct is prohibited under a criminal statute; (2) there is a sufficient causal nexus between the plaintiff's illegal conduct and plaintiff's damages; and (3) the defendant's culpability is not greater than the plaintiff's. *Romero,* 159 F. Supp. 3d at 1281. In *Romero,* the plaintiff, a recovering drug addict, brought claims for negligence and for intentional infliction of emotional distress against agents of the federal government alleging that the government rekindled his drug addiction when it targeted him in a drug trafficking investigation. *Id.* at 1279. The defendants directed a confidential informant to approach the plaintiff and propose that the plaintiff act as a broker to obtain crack cocaine; and in return, the plaintiff would keep some of the crack

for his personal use. *Id.* at 1281. Over a period of six months, the plaintiff purchased crack several times for the confidential informant in exchange for a portion of the drugs. *Id.* The plaintiff, who had been off of crack for several months prior to being approached by the confidential informant, alleged that the defendants' use of the confidential informant to target him reignited his crack cocaine addiction and caused him to become "pennilessness," to lose his familial relationships, and to become unemployable. *Id.*

The district court dismissed both of the plaintiff's tort claims under the wrongful conduct rule: "Plaintiff's own allegations demonstrate that his conduct was prohibited by federal criminal statute and was causally related to his alleged injuries, and that his conduct contributed to his injuries in a least the same degree as did the government's conduct." *Id.* The court rejected the plaintiff's argument that the wrongful conduct rule did not apply because the government's conduct, "created, funded, controlled, and furthered the 'illegal acts'" and caused the plaintiff's injuries. *Id.* at 1283. The court noted that under New Mexico law, "there may be more than one proximate cause of an injury." *Id.* (citing *Andrews v. Saylor*, 134 N.M. 545, 80 P.3d 482, 489 (N.M. Ct. App. 2003)). Thus, even though the government "created, funded, and controlled" the illegal acts, the plaintiff's role as a broker in those transactions "contributed to bringing about his injuries, his injuries would not have occurred without his participation, and his participation was reasonably connected as a significant link to his injuries." *Id.*

The Tenth Circuit affirmed the district court's application of the wrongful conduct rule. *Romero v. United States*, 658 Fed. App'x 376 (10th Cir. Aug. 10, 2016) (unpublished). The plaintiff argued on appeal that the wrongful conduct rule should not be applied in light of New Mexico's comparative fault scheme in tort cases. *Id.* at 380.

The Tenth Circuit found the argument unpersuasive and distinguished a New Mexico Court of Appeals ruling in *Rodriguez v. Williams*, --- N.M. ---, 355 P.3d 25, 29 (N.M. Ct. App. 2015). In *Rodriguez*, the New Mexico Court of Appeals declined to apply the wrongful conduct rule as a bar to an intoxicated driver's claims against another driver who ran a red light causing a collision. *Id.* The Tenth Circuit in *Romero* explained that in *Rodriguez*, application of the wrongful conduct rule was inappropriate because the intoxicated driver was not seeking to "profit from any impairment to his driving" and his damages were limited solely to the other driver's negligence under the comparative fault scheme. *Id.* (citing, *Rodriguez*, 355 P.3d at 28–29. In contrast to *Rodriguez*, the Tenth Circuit found in *Romero* that the plaintiff's damages "undoubtedly arose when [the plaintiff] engaged in illegal conduct." *Id.* The Tenth Circuit concluded that application of the wrongful conduct rule in *Romero* was therefore, "not inherently incompatible with a comparative fault framework" adopted in New Mexico. *Id.*

Plaintiffs argue that their case is distinguishable from *Romero* because, unlike brokering crack cocaine sales, their presentation of prescriptions to a pharmacist was not illegal. However, Plaintiffs cannot ignore their own admission that they worked in concert with Mr. Jones to present fraudulent prescriptions to a pharmacy and to share those drugs with Mr. Jones. As mentioned, this conduct is illegal under both federal and state law.[8]

Plaintiffs' admission also leads to the inference that their conduct, presenting false prescriptions, caused their alleged injuries or at least contributed to their injuries in at least the same degree as Defendant's illegal conduct in filling those prescriptions.

---

[8] Mr. Inge disclosed the arrangement with Mr. Jones to the Drug Enforcement Agency (DEA); and after an investigation, Mr. Jones was arrested and charged with violation of 21 U.S.C. §§ 841(a)(1). (Plfs' Supp. Jt. Status Rpt. And Prov. Discov. Plan at 4.) *See United States v. Jones*, Case No. 15 MJ 670 (D.N.M.).

However, Plaintiffs contend that their conduct was either less culpable than Defendant's conduct or alternatively, that their illegal conduct could not have come to fruition without Defendant's illegal conduct.[9] According to Plaintiffs, they could not obtain the drugs until Defendant filled the prescriptions; thus, their illegal conduct "was a result of Defendant's conduct." (Resp. at 7.) Just as the court in *Romero* rejected a similar argument, the Court will not accept this argument. *See Romero*, 159 F. Supp. 3d at 1282 (concluding that plaintiff and defendants were equally at fault). Plaintiffs, as part of a scheme to traffic in controlled substances, initiated contact with Defendant to fill prescriptions that they knew were not valid. Even though Defendant's conduct in dispensing unreasonably large quantities of narcotics to Plaintiffs violated state and federal law, and even though Defendant's conduct partially enabled Plaintiffs to abuse and traffic the drugs, Defendant's unlawful actions cannot be said to have been a greater cause of Plaintiffs' injuries than Plaintiffs' own unlawful behavior. Moreover, there are no allegations in the Amended Complaint suggesting that Defendant unduly influenced Plaintiffs or coerced Plaintiffs' illegal behavior. Thus, Plaintiffs were at least equally at fault in this case. *See id.* ("While Plaintiff characterizes the informant's offer as 'seductive and alluring,' he provides no basis to conclude that the choice to accept or reject the offer was not ultimately his.").

Plaintiffs cite *Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo County*, 773 S.E.2d 627 (W.Va. 2015) and argue that the Court should not bar their claims

---

[9] For example, Defendant may have violated 21 U.S.C. § 829, which prohibits dispensing a Schedule II controlled substance except by a valid prescription. Defendant may have also violated 21 C.F.R. §1306.04(a), which states, "An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

15

because comparative fault principles will account for their unlawful conduct. In *Tug Valley Pharmacy*, the plaintiffs sued various pharmacies and physicians alleging that the defendants improperly prescribed controlled substances for pain, which caused the plaintiffs to "become addicted to and abuse the controlled substances." *Id.* at 628. The defendants' medical practice had been under an FBI investigation, which revealed violations of federal and state law, and some of the physicians and pharmacists involved lost their licenses. *Id.* at 629. On a certified question from the trial court, the West Virginia Supreme Court declined to adopt the wrongful conduct rule and its companion doctrine of "*in pari delicto*." *Id.* at 631. Instead, the court ruled that the plaintiffs' claims could proceed and that liability for damages could be adjusted under the comparative fault doctrine. *Id.* In other words, the plaintiffs' percentage of fault was considered a fact issue for a jury rather than a complete bar to a claim. *Id.* at 633.

Unlike West Virginia, New Mexico has adopted the wrongful conduct rule, and application of the rule is appropriate in this case. The facts alleged here differ greatly from the allegations in the *Rodriguez* case in which the New Mexico Court of Appeals declined to apply the rule because a drunk driver injured by a driver who ran a red light was not trying to benefit from his own illegal behavior. Since Plaintiffs, in presenting false prescriptions, were at least equally responsible for causing their injuries, the wrongful conduct rule as applied in New Mexico bars their claims.

E. *OAKEY* DECISION ON DUTY OF PHARMACISTS DOES NOT REPUDIATE WRONGFUL CONDUCT RULE.

Plaintiffs contend that the wrongful conduct rule does not bar their claims because, under a recent New Mexico Court of Appeals ruling, Defendant was "much more culpable as a licensed pharmacist preying on the vulnerabilities of the Plaintiffs in

filling prescriptions[.]" (Resp. at 15.) Plaintiffs cite *Oakey v. May Maple Pharmacy, Inc.*, No. 34,914, 2017 WL 1382220, * 6 (N.M. Ct. App. Ap. 13, 2017) (slip op.). In *Oakey*, claims of negligence and negligence per se were brought by the representative of the estate of a nineteen year old patient who died from an overdose of physician-prescribed opioids and benzodiazepines (Oxycodone, Oxymorphone, and Alprazolam). The pharmacy that dispensed the prescription drugs argued on summary judgment that "it was entitled to judgment as a matter of law because 'a pharmacist's standard of care is to dispense appropriately prescribed medications to a patient in accordance with a proper medical doctor's prescription[,]' and the Pharmacy met that standard in filling the prescriptions at issue." *Id.* at *1. The court characterized the Pharmacy's proposed standard of care as the "clerical-accuracy standard." *Id.* at *10. The Pharmacy did not dispute there was evidence that the decedent was abusing drugs. The decedent presented and the pharmacy filled Oxycontin prescriptions between two and twenty-three days "early" on at least seven occasions between May 28, 2009 and September 21, 2009. *Id.* at *2. On at least one occasion, the decedent paid $ 1,107 in cash for 90 Oxycontin 80 mg pills in September 2009. The pharmacy argued, however, that the standard of care was met because its pharmacists accurately filled the facially valid prescriptions most of which were authorized for early filling. *Id.*

In *Oakey*, the wrongful conduct rule was not raised as a bar to the claims. The court framed the issue, which was one of first impression in New Mexico, as what standard of conduct was required of retail pharmacists "in filling prescriptions for controlled substances with a significant potential for abuse and addiction, such as Oxycodone and Oxycontin." *Id.* at *5. The court then refined its inquiry to involve "the

specific conduct required of pharmacists in these circumstances, which we view as questions of fact informed by relevant requirements prescribed by statutes and regulations governing the practice of pharmacy and dispensing physician-prescribed controlled substances." *Id.* The court rejected the clerical-accuracy standard because that standard did not take into account the federal and New Mexico statutory framework applicable to pharmacists. The court emphasized that "New Mexico regulations require pharmacists "to review the patient's profile and, '[p]rior to dispensing any prescription,' to identify issues including 'clinical abuse/misuse' and 'incorrect drug dosage.'" *Id.* at *9 (citing NMAC 16.19.4.16(D)(1)(a), (e)). The court continued, "[u]pon recognizing any of the above, a pharmacist, using professional judgment, shall take appropriate steps to avoid or resolve the potential problem[.]" *Id.* at 10 (citing NMAC 16.19.4.16(D)(2)). The court concluded that on remand, the pharmacy must present evidence that it "conformed its conduct to the standard of care required in the circumstances presented here, . . . that accounts for statutes and regulations relevant to the professional responsibilities of pharmacists filling prescriptions for controlled substances at issue here." *Id.* at *11.

Plaintiffs assert that the *Oakey* decision, imposing on pharmacists a higher duty of care when dispensing controlled substances, shows that Plaintiffs' behavior in presenting false prescriptions was less culpable than Defendant's conduct in filling obviously excessive prescriptions for controlled substances. Plaintiffs ask the Court to conclude, as a matter of law, that under *Oakey* they are less culpable than Defendant; and therefore, the wrongful conduct rule does not bar their claims. Plaintiffs' argument, however, relies on their assertion that their conduct was not illegal, which flies in the face of the facts alleged in their Amended Complaint and in their admissions in Plaintiffs' Supplemental

18

Joint Status Report. Neither *Oakey*, nor the other cases cited by Plaintiffs, convinces this Court that a New Mexico court would abandon the wrongful conduct rule under the facts alleged here. Thus, the Court holds that, as a matter of law, Plaintiffs claims are barred by the wrongful conduct rule.

      F.      COUNT III UNFAIR PRACTICES ACT CLAIM IS BARRED

Under New Mexico law, an "unfair or deceptive trade practice" means an "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services[.]" NMSA 1978 § 57-12-2. To state a claim under the New Mexico Unfair Practices Act (NMUPA), a claimant must allege facts supporting four elements. First, the complaining party must show that the defendant made an oral or written statement, visual description, or other representation that was either false or misleading. Second, the false or misleading representation must have been knowingly made in connection with the sale, lease, rental or loan of goods or services. Third, the conduct complained of must have occurred in the regular course of the defendant's trade or commerce. And fourth, the representation must have been of the type that may, tends to, or does deceive or mislead any person. *See generally, Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 749 F.Supp.2d 1235, 1259 (D.N.M. 2010) (outlining elements of NMUPA claim). New Mexico courts have emphasized that "[t]he gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services." *Id.* at 1275 (quoting *Diversey Corp. v. Chem–Source Corp.,* 125 N.M. 748, 754, 965 P.2d 332, 338 (N.M. Ct. App. 1998)).

In light of these standards, Plaintiffs' Count III NMUPA claim fails not only under the wrongful conduct rule, but also due to the absence of facts stating a plausible claim that Defendant engaged in an unfair or deceptive trade practice. Plaintiffs allege that they presented false prescriptions for narcotics to Defendant, who filled the prescriptions and sold the narcotics to Plaintiffs. Plaintiffs wholly fail to allege Defendant made a misrepresentation in connection with the filling of the prescriptions or in the sale of those drugs. Therefore, in addition to barring the claim under the wrongful conduct rule, the Court will dismiss Plaintiffs Count IV NMUPA claim because they failed to allege that Defendant knowingly made a misleading, false, or deceptive statement in connection with the sale of drugs.

IT IS ORDERED that DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT (Doc. No. 26) is granted; and a separate order of dismissal will be entered.

_____
SENIOR UNITED STATES DISTRICT JUDGE